Good morning. I understand by this point the Court may be a little bit tired of talking about 245, but if you could just indulge me for a couple more minutes. I have a question that Judge Wardlaw raised. I'm really surprised that with Grujeda out there and Ceron being on moral turpitude that we're getting all these cases. I just don't understand it. There's something going on that I've missed. Let me give you a slightly different take on it that might help. When Ceron came out, I was reading it and I was looking at it and trying to figure out what did Ceron change or not change. And it was a little bit hard to look at it and just know from the language. So what I did is I looked at what didn't Ceron say necessarily, but what did Ceron do. And here's what they did. They were trying to figure out whether the crime involving moral turpitude could be applied to this mens rea, or whether this offense would qualify as a crime involving moral turpitude. And we always have a terrible time on that. Correct. I remember another one where we said, well, in our en banc, basically we don't know what it means, so we'll just defer to the BIA. But there is one thing we know about a crime involving moral turpitude when it's aggravated assault. When the court was looking around, okay, well, what mens rea do you have to have in order for assault to be a crime involving moral turpitude? The court looked at its prior precedent and said, this isn't really clear. So they looked to what has the BIA done in the past. And they found this case, and this is the most important thing about Ceron, I think, to note, is they looked at this BIA case in Medina. And they said, all right, in Medina, you had an aggravated assault that had a recklessness mens rea, and it was aggravated assault with a weapon. Now, looking at that, that doesn't resolve our question. And so instead of saying, all right, well, we think that 245 has mens rea of recklessness, so Medina applies, and this is a CIMT, they remanded it to the BIA. So the only thing that can be drawn from what the court did in Ceron is that the court didn't think that 245, as it was understanding it, had the mens rea of a recklessness. Now, for our purposes, if the court in Ceron thought that 245 didn't have a mens rea of recklessness, there's no way that 245 could have a mens rea of intent, which is what's required for a crime of violence. So that's where I'm basically saying that we're going here. Even though the court didn't say, we're overruling Grajeda, what they did was more important. And here's why. If you took the mens rea as articulated by the court in Grajeda, and you plugged it in to what the court did in Ceron, it wouldn't make sense. If this court still had the interpretation of 245 that it did in Grajeda, it wouldn't have remanded to the BIA. It would have found it to be a CIMT. And so if the court remembers nothing else that I say today, remember this. The outcome in Ceron would have been different if we didn't have a new understanding of 245. So that's my basic point that I would really – I really hope you're not going to spend all your time talking about Ceron. Talk about the other issue. All right. Which differs your case from the other ones here. Certainly. If Your Honor would indulge me to make one last point, and then I'll move on. It's your time. All right. Judge Kleinfeld, I think you have been discussing, well, some of these cases really look like it's dangerous conduct. I understand that they certainly look that way. But we're not necessarily looking at whether it's dangerous. We're looking at whether the mens rea is intent. Now, I think one of the things that really – Whether objectively it's dangerous, no matter what the guy felt. But I – You might say, I just thought I was shooting the tire out. I didn't mean to hurt anyone or scare anyone. I'm obviously just shooting the tire out. And William says, no, that won't do. Too dangerous to shoot the tire out when you've got all these people standing around where the ricochets can hit them or the gas tank can blow up. I think we would all agree at this point, and correct me if I'm wrong, but I think we would all agree that if you run a red light and, you know, you're plowing ahead, that qualifies under 245. It depends. It depends. If I'm racing and a car is proceeding across and there's heavy traffic, yes. If it's 3 in the morning, there's no other traffic on the road and I can see headlights a mile away and there aren't any. Or if I just get confused because the green turn signal came on at an intersection that has one of those arrows and I thought that meant I could go but I couldn't, then it's not. But here's, I think, where I would differ from you on that. And I think an intent, a crime of violence, requires both an intent to do an act and an intent that this battery be committed. And in the cases that you're describing, yes, there is an intent to run a red light, but there's not an intent to hit that car. Now, there may be disregard. In the 3 in the morning case, no one would think that objectively there was a serious risk that somebody would be driving on the intersecting road with his lights off in a dark-colored car and he wouldn't be seen. But it's not about whether, and I think that's the whole point, is if you have an objective standard, the objective vision of this would be that people would know that's not good enough. And I think that's basically all William says. I think you should turn your time to the collateral attack, which seems to have, it's unique to you and it may have some merit. Certainly, Your Honor. So if the court doesn't agree with us that 245 is not a crime of violence, in my case, my client's underlying removal order was still invalid because he was eligible for 212H relief. I don't see the plausibility of his 212H claim. It looks like, yeah, he had a kid by his girlfriend, but he hadn't supported the kid. He'd been in jail most of the time, so the kid had not formed an attachment to him. I think he only had the first four months of the kid's life when he was out of jail. And boy, your kids don't get to know Maddie much in that first four months. Because the record shows that actually they brought his child to visit him in jail. I think his sister brought the child to him in jail, not the girlfriend. Correct, but we have to look at the hardship to his daughter because she's the U.S. citizen here. Now, what this court has done in the past- Missing a father that she's hardly ever seen and who had no involvement in her life other than a few jail visits? What I think this court has done in terms of looking at plausibility is they've looked at, in other cases with similar equities, has the agency granted relief? And in our briefing, we pointed to at least 17 cases where people, children, with similar types of developmental disabilities and autism were granted 212H relief. Oh, yes, we get those, but the kid can stay in the U.S., right? She's a U.S. citizen, the child. Correct. And the mom can stay with her in the U.S., right? Correct. And the dad is the one we're talking about going to Mexico, and the question is really loss of the father to the child. And if the father has not been a participating father, he has not contributed to the child's support, and his presence in the U.S. has no relevance to whether the child can get the additional educational assistance that she needs because of her mental problems. I don't agree. And I don't see why he has a plausible claim. I don't agree. First of all, I think he really has been a part of her life, but even assuming that he hasn't. The fact is that it's very necessary for this child that she have a parent who is available to take her to the doctor. And the record shows that in our case, the mother was working very long hours cleaning houses. On top of that, she was having to take her daughter to all of these appointments. But the father has never taken the child to an appointment, has he? No. If there was an issue, for instance. You're saying if we can keep him here, maybe he'll get out of jail sometime and start taking the child. If there was an issue that a person who had been in jail could not have had a plausible claim to 212H relief, then that would be the same across the board because by definition. No, not that straightforward. But here, has the father ever taken the child to a doctor's appointment? I don't believe he's had the opportunity. He was in custody the whole time? He was in custody. Eventually he's going to get out, right? Exactly. Okay, so let me ask you a question about the dozen and a half cases in the footnote. Sure. Were those all cases in which it was a U.S. citizen child that had autism and it was the parent who was petitioning for relief? Yes. So they are all like this case? Yes. Absolutely. If the court would allow me, I'd like to save the remainder of my time for rebuttal. I just would like you to deduce the facts on the plausibility standard. And Judge Kleinfeld asked you all the negative facts, but I'd like to hear why you think it was plausible. Because what this court has said with 212H is it requires something more. It requires not just a situation where it's sort of a run-of-the-mill deportation and a family split up. Well, that's important. The fact that my client's child had this very special needs situation is the something more that this court has found is enough to show plausibility. Now, in terms of his other equities, it's very clear from the record that even though my client was in jail, he had a very close relationship. He talked to his wife or called her or wrote letters every single day. His daughter was brought to visit him. He was a very important part of their lives. And the record shows that since my client has been deported, it hasn't gotten easier for his wife and his child. The record shows that she's been going through a lot and has been struggling without him. Has he provided any sort of financial support? Not that I'm aware of, Your Honor, at this point.  Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Andrew Galvin on behalf of the United States. I'll skip over the primary issue of Sorone and we'll get straight to the extreme hardship. To find that Mr. Beltran cannot show that he had plausible grounds for receiving 212H relief because he can't show that a citizen daughter would have suffered extreme hardship as a result of the deportation. Now, how is this different from the dozen and a half cases that counsel cited in the footnotes? It's very different, Your Honor. First, those cases, there was significant evidence in the record that these children, I mean, they vary. Some had autism. Some had speech. But generalizing here. Developmental disorders. Developmental disorders. There was far more evidence in the record establishing what the impairment was, what the disability was, what treatment they were receiving, and what treatment they wouldn't be able to get were they to go to the country where the parent would be deported. In this case, let's talk about what evidence there is in the record. For those cases, here it's hard to see why they'd have to go to Mexico just because the father was deported. So I'm a little more interested in whether those cases were similar in that so far the father hadn't done anything for the kids anyway. Right. I think Your Honor hit on it. Are they similar or dissimilar? Well, they're all, I mean, they're different. I can't generalize in all 17 cases. But I think the important point that you hit on, Judge Kleinfeld, is that this really comes down to economic hardship. The family doesn't have to leave, and according to what my opponent said, they didn't leave after the deportation. So then the issue is, from what my opponent said, that the mother has a hard time getting the child to the appointments. That essentially is an economic hardship. The father did not have a significant role in this child's life. If you talk about it that way, everything's an economic hardship, right? Yeah, that is not. You can reduce everything to economics at some level. That is not having two parents who can play an equal role in the raising of a child, which includes getting them to their doctor appointments. Bottom line is the child is missing one parent who could be helpful in their support and care. You know, what those cases are about, I think, isn't what those cases are about, is the difference between sort of the ordinary harm that comes from having a person deported, which of course involves economic issues, and whether there's something different in this case that's significant enough. And, yeah, you could say, I suppose, that the difference with a child with developmental disabilities is, well, you have to pay somebody to take them to the doctor rather than having a parent who won't charge you for it. But if you go there, there's no such thing as a non-economic hardship. Everything's an economic hardship. I agree, Your Honor. I think the issue in this case specifically is that there's nothing in the record to show that the child was receiving extensive treatment. What we have, and I've looked hard at it. Let's assume, for purposes of discussion right now, that the child is autistic. The mother recognized early on that there was something wrong with the child before the child even went to a doctor. She was right. The child now gets treatment. The treatment is only available in the United States. Let's assume all that. What I want to know is, I know that we have been very sympathetic to these 212-Hs in cases where there were disabled children who could only get their treatment in the U.S. and not if they were sent back to Mexico. What I want to know is, what if the parent who would have to go to Mexico wasn't doing any of these good things that the child needed when he was here? Are those other cases, the 17 cases, cases where the father wasn't doing anything for the child anyway, but we still said relief should be granted? Or were they cases where the father had been participating in the assistance the child needed? And again, we're generalizing here because it's a large number of cases. That's why I'm asking. Right. And I think your Honor is correct that in many of those cases, I won't say all because I can't say that, but in many of those cases there was evidence that there was a significant connection between the father and the mother, most likely their fathers, but from the parent and the child. And that takes it beyond just the... But in most of those cases, actually, that inquiry isn't really made. What the IJs really look at is what kinds of disability does the child have and the severity of the disability. The judges aren't looking at did the father really love the child and was he around her all the time. They don't ask that question in those cases. We're only asking it here because of the happenstance that he was in jail. And that's why the issue is coming up here. In fact, I don't remember another case that was specifically like this. Right. The issue comes down to whether there was plausible grounds for relief at the time of the deportation hearing. And at the time of the deportation hearing, all we know from the defendant's declaration is that they took the daughter to the doctor. She was less than two years old at the time of the declaration. So we can't expect that she would have been some fluent speaker. At the time of the deportation hearing, all the... But you know that early diagnosis of autism happens and it's good if it's early diagnosis is better and they try to do it before two years old. You know that, right? Yes, Your Honor. But at the time of the deportation hearing, that's all we have. And we don't have a further diagnosis until, I believe, it's over a year after the deportation. And I understand that's true and it's great that it happened. I'm not saying that it shouldn't have happened. But merely that the inquiry is what do we know at the time of the deportation hearing? All that we know is that there were some concerns from the mother about her child's ability to speak and that they took that child to the doctor. So are you saying that the law doesn't allow a court to take into account the proposition that if he had been told that he could have filed one of these petitions and would have done it, we know it wouldn't have been adjudicated instantaneously. It would have been a number of months. We don't get to take into account what would have happened and what evidence might have been brought forward in those number of months? That's correct, Your Honor. We don't get to take that into account? Correct. And I've cited multiple cases. Okay. The best one is what? I'm sorry? The best one is what? I'd say Ramirez v. Al-Kholtzy. I believe it's also in Arce v. Hernandez and then United States v. Borbin. And the reason is because it gets too speculative. For purposes of a collateral attack, you have to have a defined point in time in which we can look back and say, what do we know then? And I'm not saying that it would have been adjudicated that day. That's clearly not the case. It may have taken a year, as counsel suggests. More evidence would come in. Does the government dispute the fact that Beltran spoke with or wrote to his family nearly every day while he was in prison and that his partner and daughter visited him while he was in prison? I can't dispute it. I have no facts suggesting that that's not true. Is it the law of the circuit that if a man has a disabled child who can only receive appropriate treatment in the U.S., that he gets a waiver or is entitled to a waiver even if he's never done anything for the disabled child? I don't know if that's the law, Your Honor, but there's nothing in the record here showing that the child could not have received the same treatment in Mexico. All we have in the record is a declaration from the defendant's sister saying that she doesn't believe that treatment would be available for free in Mexico. That's the only thing we have in the record suggesting that the child could not have received treatment in Mexico, or at least free treatment. Can I just ask a question about sort of a remedy? So if hypothetically we were to conclude that he did make the showing of plausibility, what happens? What do we do? Do we send it back to the district court or do we say it's reverse period? What's the...? Well, I think there are other questions to take up also, whether the visa was readily available. Why is that an inquiry that we make at this time? How can we even possibly make it at this time? Because we don't know when the hearing. I mean, I've never seen a case where that issue was even raised on the plausibility ground that we had to also have a determination as to visa. And then if you impose that as a requirement, as of what date do you determine whether or not there was a visa available? I mean, I think if we're looking at the due process error, we don't look at whether a visa was available. We just look at whether there was a... I mean, in the situation where you're not advised of a possible avenue of relief, and this, again, was a group, one of those group deportations, and no individual circumstances were inquired of any member of the group. And so they weren't advised of a possible ground for relief. How can you say that on top of that, a visa had to be available on that day, or I don't know what day? Well, Your Honor, I agree. It's not part of the due process inquiry. It's part of the plausibility of relief. The plausibility of relief is part of the due process inquiry. Okay, well, I guess it's subsumed within it, but it's not did the I.J. err in not offering relief. It's would he have been able to get this form of relief, 212H, and the answer is that he wouldn't because there wasn't a visa application available, and we know that because the defendant said during his removal proceedings that no one had filed a visa petition on his behalf. But part of the problem is that nobody told him and it was even within the realm of possibility. So you're holding that against him too, even though it was the immigration judge that messed up? And also that's not the same question, whether anyone had filed a visa application on his behalf as to whether a visa was actually available. That's two different questions. So we don't know, and we have no way of knowing as of that date. And I don't even think it's a relevant, under the law, a relevant inquiry. May I answer, Your Honor? I believe it is under Morial Luna. I mean, the facts were very similar. The individual was trying to seek 212H relief, and the Ninth Circuit in that case said that 212H is only, rather, that you had to have an adjustment. They had to be able to adjust status, and to do that, they had to have an immediately available petition, and because there wasn't one available in that case, the person wasn't eligible for 212H relief, and therefore that relief was not plausible. I'm not sure that's exactly the circumstances. I don't think it's the same circumstances as the inquiry at the removal proceeding. Thank you. Thank you. Just briefly on the issue of my client's detention while his daughter was experiencing some of these issues, I want to read a quote from an unpublished BIA case that is on page 20 of our opening brief, and it says, With respect to emotional harm, the immigration judge cited significant hardship that the family has endured during the respondent's detention, such that his children, in particular his son, were experiencing problems in school. What this shows is that it's not just about whether my client was detained or not. In fact, a client's detention can actually add to or aggravate the hardship to a child. So I think that this question is... But how could it hear? Because he wasn't available, and that caused... He's 11, and the dad goes off to prison. That's real different from a dad who's really never known the kid other than in the kid's first months of being a baby. Well, I think the expectation is that dad is there. He wasn't, unfortunately, able to be there at the beginning. That doesn't mean he wouldn't be there after. I just want to also move on to another point about plausibility. And here's the point I would make. By definition, if you're applying for a 212-H waiver, you've committed a crime, and you've probably done time for it. So of the 17 cases we cited, almost certainly many of them were in jail when their children were young. So we only need to show that it's plausible. I think those 17 cases have more than done so. Well, is the government correct that you have to also show that a visa would have been available? And if so, at what point in time would you have to show it? And how would it be shown? Well, Your Honor, I agree with Your Honor. I don't think that's really part of the calculus. But assuming it is, we've actually argued here that Mr. Beltran was eligible for a standalone 212-H waiver. And BIA case law at that time, under Matter of Sanchez and Matter of Boese, said that he should have been eligible for that waiver, in which case he would not have actually even required a visa. So I don't think that that is necessarily relevant. A standalone? A standalone 212-H waiver, Your Honor. What does that mean exactly? It basically means that a person who is an LPR and, for instance, is in invisibility proceedings, would be able to get that 212-H waiver without necessarily going through the whole adjustment of status process again. That's right. He was an LPR at the time. Sanchez. And what was the other case? Matter of Sanchez and Matter of Boese. A-B-O-S-E. And those are in our briefing. Right. All right. Thank you. Thank you, Your Honor. So, United States v. Beltran is submitted.
judges: Kennelly, Kleinfeld, Wardlaw